1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JEROME CEASAR ALVERTO,

               Plaintiff,

    v.

CHRISTOPHER SCHENK, *et al*.,

               Defendants.

Case No. C18-1381-JCC

REPORT AND RECOMMENDATION

      Plaintiff Jerome Ceasar Alverto ("Plaintiff") is proceeding *pro se* and *in forma pauperis* in this 42 U.S.C. § 1983 action alleging that several employees of the Monroe Correctional Complex ("MCC") in Monroe, Washington retaliated against him for his grievance activity. (Dkt. # 35 ("Am. Compl.").) This matter comes before the Court upon the parties' cross-motions for summary judgment, as well as Plaintiff's subsequent motion to withdraw his state law claims. (Dkt. ## 40 ("Pl.'s Mot. Summ. J."); 48 ("Defs.' Mot. Summ. J."); 66 ("Pl.'s Mot. to Withdraw State Law Claims")).) Having considered the governing law, the parties' submissions, and the balance of the record, the Court recommends that Defendants' motion for summary judgment be GRANTED, Plaintiff's motion for summary judgment be DENIED, and Plaintiff's motion to withdraw his state law claims be GRANTED.

# I.    BACKGROUND

In this civil rights action, Plaintiff alleges numerous instances of retaliation by the Defendants based upon grievances Plaintiff filed following his alleged interactions with Defendant Corrections Officer Christopher Schenk at MCC. The other Defendants in this action are Grievance Coordinator Pete Maxson, Correctional Program Manager ("CPM") Mark Miller, and four employees of the Custody Roster Office who manage the assignment and scheduling for custody staff at MCC, Alma Holevinski, Kaitlin Bos, Erika Rogalski, and David Nevarez (the "Roster Office Defendants").

The first alleged interaction between Plaintiff and Officer Schenk took place on August 17, 2017, when Plaintiff was involved in an altercation with another incarcerated individual while performing his porter job duties. According to Plaintiff, the argument was "pretty heated" and "could have come to fisticuffs [sic]." (Dkt. # 50 ("Counsel Decl."), Exhibit 1 ("Pl.'s Dep.") at 21:9-18.) Observing this situation, Officer Schenk told Plaintiff to return to his cell. (Dkt. # 51 ("Schenk Decl.") at ¶ 4.) Officer Schenk told Plaintiff that he "was layed in from work duties on the unit and that [Schenk] would speak to [Plaintiff] later when [Plaintiff] had calmed down." (*Id.*, Ex. 1 (8/19/2019 Offender Behavior Observation).)

Plaintiff alleges that Officer Schenk's response to this incident constituted retaliation for a grievance that Plaintiff had previously filed against a former Department Correctional Officer Fagan in 2017. (Am. Compl. at ¶¶ 12, 18; Dkt. # 52 ("Maxson Decl."), Ex. 1 (Plaintiff's 8/14/17 grievance regarding Officer Flagan).) Defendant Pete Maxson, as Grievance Coordinator for MCC, received a grievance from Plaintiff on August 28, 2017 to this effect, alleging misconduct by Officer Schenk. (Maxson Decl. at ¶¶ 2, 5.) Specifically, Plaintiff alleged that "C/O Schenk is targeting me with retaliation because I filed [a ] grievance against the disgraced C/O Fagan."

(*Id*., Ex. 2.) He asserted that his prior grievance was the real reason Officer Schenk "took my job for the day," rather than the altercation with the other inmate. (*Id*.) This incident was investigated by Defendant Maxson, whose conclusion was that there was "no evidence found to support [Plaintiff's] allegations against Officer Schenk." (*Id*.) Officer Schenk asserts that he never had any knowledge of Plaintiff's prior grievance regarding Officer Fagan, either from Officer Fagan himself, the grievance investigation, or any other source. (Schenk Decl. at ¶ 3.)

Plaintiff next alleges that on September 7, 2017, Officer Schenk "bumped" him and later the same day allegedly called him a "grieving motherfucker." (Maxson Decl, Ex. 3 (9/8/2017 grievance).) This grievance was once again investigated, this time by Sgt. Dopson who was allegedly speaking with Plaintiff at the time of the "bump." (*Id*., Ex. 4.) Sgt. Dopson did not recall Officer Schenk making any contact with Plaintiff as he passed by, and Plaintiff did not mention being "bumped" at the time. (*Id*.) After Plaintiff was provided with the opportunity to support his allegations and failed to do so, the grievance was denied by Superintendent Warner as "no evidence was found to support [the] allegation." (*Id*.)

Plaintiff appealed, asserting that video of the incident with Officer Schenk should have been available and "cameras are not placed in these [areas] by design to allow C/Os and/or offenders to get away with behaving [sic] and other bad acts." (*Id*., Ex. 5.) When the grievance staff re-typed Plaintiff's complaint to respond to it, Plaintiff's words were mis-typed to read, "cameras are not placed in these *by decision* to allow C/O's and/or offenders to get away with behaving and other bad acts." (*Id*., Exs. 6-7 (emphasis added).) A DOC manager reviewed the initial grievance, appeal, and all responses, and concluded that "a complete investigation was conducted" and "there is no information available to support your allegation[.]" (*Id*., Ex. 7.)

Plaintiff alleges that this investigation of his grievance was conducted in a retaliatory manner, because the grievance staff replaced the word "design" with "decision" when they typed his appeal. (Am. Compl. at ¶ 14.) Defendant Maxson, however, asserts in his declaration that the inadvertent typo would have been corrected if it had been timely discovered, but did not affect the processing of the grievance as the meaning of the Plaintiff's allegation — that Department cameras were intentionally not placed in specific locations — was clear despite the typo. (Maxson Decl. at ¶¶ 8-10.)

Plaintiff next alleges that he encountered Officer Schenk on September 24, 2017 on the tier while he was waiting for a floor officer to approach him and radio the booth to open his cell door. (Pl.'s Dep. at 40:25-42:5.) Plaintiff testified in his deposition that the tier was so narrow that it may be difficult for two adult males to pass, and Plaintiff squeezed himself against a wall and was within inches of Officer Schenk touching him. (*Id*. at 40:25-42:5, 46:5-47:2.) Officer Schenk radioed the booth to let Plaintiff into his cell only after he had passed, which Plaintiff perceived as "an act of intimidation." (*Id*. at 42:1-5.) Plaintiff further asserted that Officer Schenk reappeared about five minutes later and "violently slammed the sign . . . shut." (Maxson Decl., Ex. 8 (10/23/2017 grievance).) This event was also investigated, and it was found that Plaintiff's "version of events [was] directly refuted by everyone that was interviewed." (*Id*.)

The following day, on September 25, 2017, Plaintiff met with several of Officer Schenk's supervisors, including Defendant Mark Miller, Unit Sgt. Dopson, and Lieutenant Allen. (Dkt. # 53 ("Miller Decl.") at ¶ 4.) Defendant Miller asserts that prior to the meeting he was advised by Sgt. Dopson, Lt. Allen, and Pete Maxson that Plaintiff had been focusing on Officer Schenk by fixating on him with long and intimidating stares and submitting baseless complaints targeting him. (*Id.* at ¶ 3.) Plaintiff was escorted to the shift lieutenant's office for the meeting, where

1  Plaintiff was advised that his stares, physical posturing, and fixation on Officer Schenk were

2  interpreted as intimidation by MCC staff. (*Id*. at ¶ 4.) Defendant Miller asserts that the meeting

3  was intended as a learning opportunity for Plaintiff, who at times had difficulty "tracking and

4  reading social [cues]." (*Id*.) Plaintiff was "loud and defensive and did not want to continue the

5  discussion." (*Id*.) However, it was made clear to Plaintiff that "any threatening or intimidation

6  towards staff in the future will not be tolerated." (*Id*., Ex. 1 (9/25/17 Offender Behavior

7  Observation).)

8      Officer Schenk did not participate in the meeting with Plaintiff in the shift office.

9  (Schenk Decl. at ¶ 7.) However, after Plaintiff returned to the unit from this meeting, he went to

10  the Officer's Station on tier 3, and allegedly stopped and stared directly at Officer Schenk for

11  two long seconds. (*Id*. at ¶¶ 7-8; Dkt. # 49 ("Rule Decl."), Ex. 6 (9/25/2017 Serious Infraction

12  Report by Officer Schenk, describing the staring and that "I felt intimidated and that my physical

13  safety was at risk.").) Based on this interaction, Officer Schenk filed a serious infraction report,

14  or a WAC 663 violation, for "using physical force, intimidation, or coercion against any person."

15  (Rule Decl., Ex. 6.) A fact-finding hearing was held on October 5, 2017, and Plaintiff stated that

16  he had heard his name called and turned his head towards Officer Schenk, turning away when

17  Officer Schenk did not say anything. (*Id*.) Plaintiff was ultimately found not guilty of the

18  infraction. (*Id*.) Officer Schenk asserts that at the time he filed the infraction, he believed that

19  Plaintiff's behavior fit the description. (Schenk Decl. at ¶ 8.) Officer Schenk also does not recall

20  ever being advised as to the outcome of the infraction hearing. (*Id*.)

21      Officer Schenk asserts that following the interaction that led to the infraction, he

22  continued to fear for his safety, because Plaintiff did not appear to change his behavior of

23  "star[ing] at me, physically postur[ing], and mak[ing] me feel uncomfortable for months." (*Id*. at

¶ 9.) Officer Schenk believed that Plaintiff's behavior was "off his baseline and may have been a product of mental health issues," and he believed "he may have been planning something or wanted to harm me." (*Id.*) "This eventually began to interfere with my job duties, as I was always on high alert and feared for my safety around Alverto." (*Id.*)

As a result of Officer Schenk's ongoing concern, CPM Miller entered a prohibited placement preventing Plaintiff from being placed at the Washington State Reformatory ("WSR") in the MCC for a six-month period beginning on October 5, 2017. (*Id.*; Miller Decl., Ex. 2.) The prohibited placement provides as follows:

> Inmate has been focused on this employee and the employee has felt threatened. While the infraction was not upheld, there is sufficient evidence to support the PH. Grievance Coordinator P. Maxson was contacted and verified that this individual has filed multiple grievances against this staff member that upon investigation were unfounded.

(Miller Decl., Ex. 2.)

Officer Miller asserts that this prohibited placement was intended as a "cooling period" so that Plaintiff could have a fresh start if he were to return to the facility, and to "ensure the safety of Schenk and Alverto and maintain the order so that Schenk could perform his job duties." (*Id.* at ¶ 8.) Officer Miller believed that Officer Schenk "feared for his physical safety and . . . was always looking over his shoulder because Alverto would not stop posturing, leering, and otherwise intimidating Schenk. When relations between staff and incarcerated individuals reach this level, I fear that it could turn into a physical altercation." (*Id.*) Officer Miller notes that six months is the shortest amount of time that he could approve a prohibited placement, and it was narrow in scope because it was limited to the WSR as opposed to applying to the whole MCC complex (which is made up of four other facilities). (*Id.* at ¶ 9.) Plaintiff was subsequently transferred to another facility. (Rule Decl., Ex. 7 (reflecting temporary facility reassignments for

1    Plaintiff to Coyote Ridge Corrections Center and then Airway Heights between November 2017

2    to April 2018).)

3           When the prohibited placement ended on April 5, 2018, Plaintiff was transferred back to

4    MCC and was placed in the Special Offenders Unit (SOU). (*Id*.) By this time, Officer Schenk

5    had transferred to a position as a Relief and Training Officer which meant that he was assigned

6    to posts within the five MCC facilities to fill in for other officers' scheduled and unscheduled

7    absences. (Schenk Decl. at ¶ 2.) Officer Schenk's assignments as a Relief Officer occurs through

8    the Custody Roster Office, where staff place available correctional officers into vacant posts

9    throughout the MCC facilities on an as-needed basis. (Dkt. # 54 ("Holevinski Decl.") at ¶¶ 3-4.)

10   There are approximately 70 relief assignments made by the Roster Office on a daily basis. (*Id*.)

11   Given the volume of assignments that need to be made every shift, the Roster Office staff

12   generally do not place weight on special considerations of the post or the specific needs or

13   preferences of staff, including inmates' past prohibited placements, in making the relief

14   assignments. (*Id*. at ¶¶ 4, 6.) In fact, the Roster Office does not even have access to this

15   information. (*Id*. at ¶ 7.) Moreover, the rosters are generally set weeks in advance and are not

16   changed absent a last-minute change in circumstances, or a decision by a Sergeant "under the

17   supervision of the Lieutenant through the chain of command." (*Id*. at ¶ 5.) Thus, there appears to

18   be no way for correctional officers such as Officer Schenk to request specific posts or hours. (*Id*.

19   at ¶ 9.)

20          The record reflects that in his new role as a Relief and Training Officer, Officer Schenk

21   continued to encounter Plaintiff sporadically. In July 2018, Plaintiff claimed that Officer Schenk

22   had once again stared at him in the SOU Dining Hall in an attempt to harass and intimidate him,

23   and that Officer Schenk seemed to be going out of his way to engage and have contact with

Plaintiff. (Maxson Decl., Ex. 9.) This claim was again investigated, and Defendant Maxson

responded that Plaintiff's allegations were unsupported and the prohibited placement had expired

prior to July 20, 2018, and therefore Officer Schenk had no control over where he was assigned

and could not have intentionally sought out the Plaintiff. (*Id*.) Defendant Maxson further

explained that "it is the expectation as an officer that Officer Schenk will observe movement and

behavior . . . including you. It is unfortunate that you continue to falsely believe that you are

being targeted in some way by Officer Schenk and suggest[] that you might consider seeking

conversation with your mental health provider to discuss your perceived issues with Officer

Schenk." (*Id*.)[1]

Plaintiff's allegations regarding Officer Schenk continued through March 2019. Plaintiff

alleged that Officer Schenk refused to scan his meal card on August 3, 2018, although Plaintiff

also admitted during his deposition that he was able to take a tray and eat lunch that day. (Pl.'s

Dep. at 88:18-89:12.) Similarly, Plaintiff alleges that Officer Schenk swore at him and refused to

allow him to make phone calls on October 1, 2018, despite the record showing that he had, in

fact, placed phone calls that day. (Am. Compl. at ¶ 33; Rule Decl., Ex. 9 (call log).) Similarly,

although Plaintiff asserts that Officer Schenk made a sexually-inappropriate comment towards

him in November 2018 and "lustfully gawked" at Plaintiff while he was showering, the

grievance investigation (which included review of the video) determined that "the video does not

support [Plaintiff's] allegation of [Officer Schenk's] behavior being unprofessional or aggressive

toward [Plaintiff] in anyway . . . The interviews and video evidence do not support your

allegation against the staff." (Am. Compl. at ¶ 35, Ex. 20 (11/20/18 grievance and 1/8/19

response).)[2] Finally, Plaintiff alleged in March 2019 that Office Schenk's movements in the

---

[1] Plaintiff's appeal of the denial of his grievance was also denied. (*Id*.)
[2] Plaintiff's appeal of the denial of this grievance in January 2019 was denied. (Dkt. # 35 at 87.)

1    chow hall reflected that he was "determined and going out of his way, abusing his position, to

2    continue intimidating/harassing me in retaliation because I filed a lawsuit against him." (*Id*., Ex.

3    21.)

4            Plaintiff filed his amended complaint in this action in August 2019, arguing that each of

5    the Defendants unlawfully retaliated against him for his grievance activity regarding Officer

6    Schenk. (Am. Compl.) In his motion for summary judgment, Plaintiff asks the Court to find that

7    Defendants took adverse action against him because of his protected conduct, *i.e*., his grievance

8    activity, and that Defendants' conduct chilled his exercise of his First Amendment rights and did

9    not reasonably advance a legitimate correctional goal. (Pl.'s Mot. Summ. J.) Defendants ask the

10   Court to grant their motion for summary judgment because Plaintiff has not demonstrated a

11   genuine issue of material fact as to any of the required elements of a prisoner's First Amendment

12   retaliation claim. (Defs.' Mot. Summ. J.)

## II.    LEGAL STANDARDS

### A.    Summary Judgment Standard

14

15           Summary judgment is appropriate if there is no genuine dispute as to any material fact

16   and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The

17   moving party bears the initial burden of demonstrating the absence of a genuine issue of material

18   fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the

19   burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could

20   find other than for the moving party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th

21   Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the

22   moving party can prevail merely by pointing out to the district court that there is an absence of

23   evidence to support the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325. If the moving

1    party meets the initial burden, the opposing party must set forth specific facts showing that there

2    is a genuine issue of fact for trial to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

3    242, 250 (1986). The court must view the evidence in the light most favorable to the nonmoving

4    party and draw all reasonable inferences in that party's favor. *Reeves v. Sanderson Plumbing*

5    *Prods.*, 530 U.S. 133, 150-51 (2000).

6         However, the court need not, and will not, "scour the record in search of a genuine issue

7    of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The opposing party must

8    present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford*

9    *Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). Uncorroborated allegations and

10   "self-serving testimony" will not create a genuine issue of material fact. *Villiarimo v. Aloha*

11   *Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002); *T.W. Elec. Serv. v. Pac Elec. Contractors*

12   *Ass'n*, 809 F. 2d 626, 630 (9th Cir. 1987).

13        B.    <u>Section 1983 Claim for Retaliation under the First Amendment</u>

14        To sustain a § 1983 civil rights claim, Plaintiff must show (1) he suffered a violation of

15   rights protected by the Constitution or created by federal statute, and (2) the violation was

16   proximately caused by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48

17   (1988); *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). To satisfy the second prong,

18   Plaintiff must allege facts showing how individually named defendants caused or personally

19   participated in causing the harm alleged in the complaint. *Arnold v. IBM*, 637 F.2d 1350, 1355

20   (9th Cir. 1981).

21        The First Amendment protects prisoners' right to file grievances and pursue civil rights

22   litigation in federal court without retaliation. *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir.

23   2012); *Silva v. DiVittorio*, 658 F.3d 1090, 1104 (9th Cir. 2011). "Within the prison context, a

1    viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a

2    state actor took some adverse action against an inmate (2) because of (3) that prisoner's

3    protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment

4    rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v.*

5    *Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

6        Although timing can be considered as circumstantial evidence of retaliatory action,

7    timing alone cannot establish retaliation and the overall circumstances must be considered. *Pratt*

8    *v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 681

9    (2009). This timing-plus requirement is particularly necessary in the prison context because an

10   incarcerated individual is subject on a daily basis to many decisions and rules that could be

11   considered adverse and an inmate cannot avoid the consequences of such actions by filing

12   grievances and lawsuits. *See Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995) ("To assure that

13   prisoners do not inappropriately insulate themselves from disciplinary actions by drawing the

14   shield of retaliation around them, trial courts must carefully scrutinize these claims.").

15       Moreover, a retaliation claim is not plausible if there are "more likely explanations" for

16   the actions. *See Ashcroft*, 556 U.S. at 681; *Pratt*, 65 F.3d at 808. The plaintiff "bears the burden

17   of pleading and proving the absence of the legitimate correctional goals for the conduct of which

18   he complains." *Pratt*, 65 F.3d at 808. To establish a retaliation claim, a plaintiff must show his

19   protected conduct was the substantial or motivating factor behind the defendant's conduct. *See*

20   *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009).

21       C.    <u>Qualified Immunity</u>

22       The doctrine of qualified immunity protects government officials from civil liability

23   under § 1983 if "their conduct does not violate clearly established statutory or constitutional

1    rights of which a reasonable person would have known." *Stanton v. Sims*, 571 U.S. 3, 5-6 (2013)

2    (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Qualified immunity

3    gives government officials breathing room to make reasonable but mistaken judgments about

4    open legal questions" and "protects 'all but the plainly incompetent or those who knowingly

5    violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475

6    U.S. 335, 341 (1986)). "To determine whether an officer is entitled to qualified immunity, a

7    court must evaluate two independent prongs: (1) whether the officer's conduct violated a

8    constitutional right, and (2) whether that right was clearly established at the time of the incident."

9    *Castro v. Cnty. of L.A.*, 797 F.3d 654, 663 (9th Cir. 2015) (citing *Pearson*, 555 U.S. at 232).

10   Either prong may be considered first. *Id.* (citing *Pearson*, 555 U.S. at 236).

### III.    DISCUSSION

11

12       A.    <u>Retaliation Claim Against Officer Schenk</u>

13            As discussed in detail above, Plaintiff describes numerous interactions with Officer

14   Schenk between August 2017 and March 2019, and argues that each of these interactions

15   involved retaliatory conduct due to Plaintiff's grievance activity. (Dkt. # 35 ("Alverto Decl.") at

16   19-33.) Defendant responds that Plaintiff has failed to provide any evidence of retaliatory intent

17   beyond his own conclusory allegations. (Defs.' Mot. Summ. J. at 9.) In addition, Defendants

18   contend that many of the actions taken against Plaintiff by Officer Schenk were so minor that

19   they cannot serve as the basis for a retaliation claim, or alternatively, were motivated by

20   legitimate penological goals. (*Id.*) As discussed below, the Court finds that Officer Schenk is

21   entitled to summary judgment on Plaintiff's retaliation claims.

22

23

1

2

     (1)  *Plaintiff Has Not Provided Evidence that Officer Schenk's Alleged*
        *Actions Were Motivated by Plaintiff's Grievance Activity*

3

   To show causation, a plaintiff must initially show that his protected conduct was the

4

substantial or motivating factor behind the defendants' conduct. *See Brodheim*, 584 F.3d at 1271;

5

*see also Soranno's Gasco, Inc. v. Morgan,* 874 F.2d 1310, 1314 (9th Cir. 1989); *Mt. Healthy*

6

*City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). The burden then shifts to

7

defendants to prove "by a preponderance of the evidence that they would have reached the same

8

decision in the absence of the protected conduct." *Id.* at 1315. "[T]iming can be considered as

9

circumstantial evidence of retaliatory intent." *Pratt,* 65 F.3d at 808.

10

   As noted above, Plaintiff describes at least five discrete interactions with Officer Schenk

11

that he asserts, in a conclusory manner, constituted retaliation. First, Plaintiff argues that Officer

12

Schenk's alleged improper suspension of his employment in August 2017, as well as the

13

September 24, 2017 "assault" where Officer Schenk allegedly pushed Plaintiff back against a

14

wall, both occurred "because of his participation in the grievance program." (Am. Compl. at ¶

15

18.) Second, Plaintiff alleges that Officer Schenk interfered with his ability to "participate in the

16

lunch program" on August 3, 2018, and stared at him in an intimidating fashion in the chow hall

17

on July 16, 2018, due to a retaliatory motive. (*Id.* at ¶¶ 31-32.) Third, Plaintiff alleges Officer

18

Schenk swore at him and interfered with his request to make a phone call on October 1, 2018,

19

although the amended complaint contains no specific reference to protected activity. (*Id.* at ¶ 33.)

20

Fourth, Plaintiff asserts that Officer Schenk conducted an inappropriate search/inappropriately

21

observed him showering in the nude on October 2, 2018. (*Id.* at ¶¶ 32, 35-36.) Fifth, Plaintiff

22

alleges that Officer Schenk purposefully came in close contact with Plaintiff in the chow hall to

23

harass and intimidate Plaintiff on March 2, 2019. (*Id.* at ¶ 37.) Plaintiff asserts in a conclusory

1  fashion that these instances resulted "because of is participation in the grievance program[.]" (*Id.*

2  at ¶ 18.)

3       Plaintiff has failed to provide evidence, beyond his own conclusory assertions and

4  speculation, to raise an issue of fact as to the necessary causation for each of the instances

5  discussed above. In other words, Plaintiff has failed to come forth with evidence to show that his

6  grievance activity was the substantial or motivating factor behind Officer Schenk's conduct. *See*

7  *Brodheim*, 584 F.3d at 1271. For example, the triggering event identified by Plaintiff for Officer

8  Schenk's first alleged act of retaliation – Officer Schenk's alleged retribution for Plaintiff's

9  grievance regarding Officer Fagan – is contradicted by the evidence submitted by Defendants.

10  As noted above, not only was Officer Schenk not told about Plaintiff's grievance by Officer

11  Fagan, but he did not learn of it through the grievance investigation or any other source. (Schenk

12  Decl. at ¶ 3; Maxson Decl. at ¶ 4.) When Plaintiff was asked during his deposition what evidence

13  he had that Officer Schenk had learned about the Fagan grievance, Plaintiff conceded that he did

14  not have any. (Pl.'s Dep. at 33:22-34:2.)

15       Moreover, when Plaintiff was asked how he knew that Officer Schenk bumping into him

16  on September 7, 2017 was related to his prior grievance activity, Plaintiff referenced Officer

17  Schenk's *subsequent* statement (which was not supported by any evidence) calling Plaintiff a

18  "grieving motherfucker." (Am. Compl. at ¶ 13.) Plaintiff also waivered in his deposition as to

19  when Officer Schenk made these alleged comments. (Pl.'s Dep. at 33:22-34:2.)

20       Finally, the Court's review of Officer Schenk's 663 infraction reflects that Plaintiff's

21  grievance activity was not a substantial or motivating factor behind the infraction. Rather, the

22  infraction was primarily motivated by Plaintiff's pattern of behavior, including intimidating

23  stares and posturing, which did not cease despite Plaintiff's September 25, 2017 meeting with

Officer Schenk's superiors to address Plaintiff's behavior toward Officer Schenk. (Rule Decl, Ex. 6.) Although Plaintiff's grievance activity is mentioned in the infraction report as part of Officer Schenk's explanation for why he felt personally targeted and threatened, the basis of the infraction was clearly Plaintiff's intimidating behavior promptly following the meeting. Plaintiff even acknowledged during his deposition that he was aware that Officer Schenk's concerns for his safety were the driving force behind the infraction and ultimately his temporary transfer to a different facility: "I was told that based on Defendant Schenk having concerns for his safety – and that was mentioned in the infraction – that prohibition was in place. And based on the prohibition, I was moved to a different place." (Pl.'s Dep. at 75:13-24.)

Accordingly, the Court finds that Plaintiff has failed to establish a genuine issue of material fact as to whether his grievance activity was the substantial or motivating factor behind Officer Schenk's conduct in this case. *See Brodheim*, 584 F.3d at 1271. Although Plaintiff alleges that many of his interactions with Officer Schenk occurred close in time to his filing of grievances, timing is only circumstantial evidence of retaliatory intent. *See Pratt,* 65 F.3d at 808. Without more, the fact that Plaintiff's interactions with Officer Schenk occurred close in time to his grievances is not sufficient to establish causation in this case, especially in light of the evidence in the record provided by Defendants.

(2)    *Plaintiff Has Not Shown Officer Schenk's Conduct Would Chill an Inmate of Ordinary Firmness*

To demonstrate injury, an inmate must show that his First Amendment rights were chilled or infringed by the alleged retaliatory action. *See Resnick v. Hayes,* 213 F.3d 443, 449 (9th Cir. 2000). The "chilling inquiry" is governed by an objective standard, as "a plaintiff does not have to show that 'his speech was actually inhibited or suppressed,' but rather that the adverse action at issue 'would chill *or* silence a person of ordinary firmness from future First Amendment

1    activities.'" *Brodheim,* 584 F.3d at 1271 (quoting *Rhodes,* 408 F.3d at 568–69 (original quoted

2    source omitted)). Certain actions are so *de minimis* that they cannot be considered adverse action

3    for purposes of First Amendment retaliation. *Id.* at 562 n.11 (requiring harm that is more than

4    minimal). Adverse action must also be viewed in light of the prison environment and the

5    deference given to correctional officials. *See Davis v. Goord*, 320 F.3d 356, 353 (2d Cir. 2003).

6          Many of the interactions between Officer Schenk and Plaintiff, addressed above, fail to

7    meet this "more than minimal" standard because of the norms of prison life. Specifically, Officer

8    Schenk sending Plaintiff to his cell on August 7, 2017, after his "heated" altercation with another

9    inmate that Plaintiff admitted could have come to "fisticuffs," was not outside the bounds of

10   normal prison life. (Pl.'s Dep. at 21:9-18.) Similarly, Plaintiff's allegation that Officer Schenk

11   "bumped" into him on September 7, 2017, without more, also does not constitute adverse action.

12   Although Plaintiff characterizes this interaction in his amended complaint as an "assault," his

13   contemporaneous grievance indicated that Officer Schenk only bumped into him. (Maxson Decl.,

14   Ex. 3.) Moreover, the grievance investigation found Plaintiff's allegation that the "bump"

15   occurred at all to be unsupported by the other witnesses. (*Id.*, Ex. 4.) In any event, the alleged

16   "bump" is not sufficient to constitute an adverse action, or chill a prison inmate of ordinary

17   firmness.

18         In addition, without more, Officer Schenk's mere presence in an area such as the "chow

19   hall," or observation of Plaintiff from afar, even if true, is not sufficient to constitute adverse

20   action. For example, Plaintiff's claim that Officer Schenk passed him on the tier and delayed

21   Plaintiff's entrance into his cell on September 24, 2017, but radioed the booth to let Plaintiff in

22   after he had passed, is insufficient to constitute adverse action. Plaintiff testified that Officer

23   Schenk did not make physical contact with him during this incident, and facilitated entrance into

his cell after he had passed. (Pl.'s Dep. at 40:25-42:5, 46:5-47:2.) He also conceded that it is a

"really narrow space when someone – two people couldn't walk shoulder to shoulder there." (*Id*.

at 46:18-21.)

Similarly, Officer Schenk's alleged observations of Plaintiff on July 16, 2018 and August

3, 2018 in the lunchroom, November 19, 2018 when he was changing, and March 2, 2019 when

Officer Schenk allegedly positioned himself by Plaintiff, are not sufficient to constitute adverse

action. As discussed above, although Plaintiff alleges that Officer Schenk did not scan his lunch

card on August 4, 2018, Plaintiff testified that he did receive his lunch anyway. (Pl.'s Dep. at

88:18-89:12.) Moreover, Plaintiff's allegations that Officer Schenk acted inappropriately in

observing Plaintiff while he was undressed were rejected following the grievance investigation.

Even if this was not the case, however, an observation by a correctional officer of an inmate in a

state of undress, without more, is also an incident of normal prison life.

Finally, Plaintiff's assertion that Officer Schenk has used inappropriate language towards

him on two occasions is not sufficiently adverse to support a retaliation claim. *See Somers v.*

*Thurman*, 109 F.3d 614, 624 (9th Cir. 1997) ("the exchange of verbal insults between inmates

and guards is a constant, daily ritual observed in this nation's prisons of which we do not

approve, but which do not violate the Eighth Amendment."). First, the October 1, 2018 incident

in which Officer Schenk allegedly swore through the intercom when he was in the booth at

9:00 a.m. and would not allow Plaintiff to use the phone is contradicted by the evidence that

Officer Schenk was not in the booth at that time. (Rule Decl., Ex. 8; Pl.'s Dep. at 98:15-24.)

Plaintiff testified that he did not know who was in the booth at the time, but he saw Officer

Schenk in the booth twenty or thirty minutes later and thought his voice matched the one he had

heard. (*Id*. at 97:13-98:24.) Regardless, however, the phone booth records reflect that Plaintiff

was allowed to use the phone on that same day. (Rule Decl., Ex. 9.) Even if Plaintiff suffered, at most, inappropriate and harsh language from Officer Schenk, this would not be sufficient to chill an ordinary inmate from exercising his First Amendment rights.[3]

Accordingly, none of these alleged actions by Officer Schenk were sufficiently serious so as to constitute adverse action.

(3)   *Plaintiff Has Not Shown that the Serious Infraction Did Not Serve a Legitimate Penological Interest*

Plaintiff contends that, because he successfully appealed the serious infraction entered by Officer Schenk, Officer Schenk must have issued that infraction based upon a motivation to retaliate, rather than a legitimate correctional goal. In addition, the infraction specifically mentions Plaintiff's grievance activity, which Plaintiff asserts establishes the necessary causal link. (Am. Compl. at ¶¶ 21-29.)

As discussed above, Officer Schenk wrote an infraction for intimidation on September 25, 2017, after Plaintiff's meeting with Officer Schenk's supervisors regarding Plaintiff's pattern of behavior. Defendants have provided substantial evidence in the record reflecting that Officer Schenk had been feeling intimidated by Plaintiff's behavior for months, and Plaintiff's concerning behavior had included submitting numerous grievances regarding Officer Schenk that following an investigation were ultimately found to be baseless. (Schenk Decl. at ¶ 7.) During the meeting with Officer Schenk's superiors, Plaintiff was warned that his behavior (which included the grievances, physical posturing, and staring at Officer Schenk) was perceived as intimidating and that he needed to stop. (Miller Decl. at ¶¶ 4-5.) However, Officer Schenk observed that Plaintiff returned to the unit, stopped, and promptly stared directly at Officer

---

[3] Similarly, Plaintiff's assertion that Officer Schenk allegedly whispered inappropriate comments to sexually harass Plaintiff during a search, without more, would not chill the exercise of his rights. (Dkt. # 35 at ¶ 35.)

Schenk for two long seconds. (Rule Decl., Ex. 6.) As Plaintiff appeared to be promptly continuing his attempts to intimidate Officer Schenk after being warned by his superiors to cease this behavior, the evidence in the record indicates that Officer Schenk wrote the infraction because he feared for his safety and believed Plaintiff's conduct satisfied the infraction.

Regardless of the fact that the infraction was ultimately overturned following the hearing, the uncontradicted evidence supports the conclusion that Officer Schenk issued the infraction based upon his understanding of the DOC policy and the legitimate penological objectives underlying the policy regarding intimidation. *See* WAC 137–25–030(663) ("Using physical force, intimidation or coercion against any person .") There is no evidence that Officer Schenk issued the infraction out of retaliatory intent, rather than to advance a legitimate penological goal in preventing intimidation of correctional officers by inmates.

Finally, the Court finds that Officer Schenk's other conduct – observing Plaintiff in the lunchroom or sending Plaintiff to his cell following a heated argument with another inmate – also reasonably advanced legitimate penological goals. As Plaintiff has not come forth with any evidence that Officer Schenk's conduct was not driven by a desire to advance legitimate correctional goals, apart from a conclusory assertion that he must have had a retaliatory motive, Plaintiff has failed to establish a genuine issue of material fact to preclude summary judgment on his retaliation claims against Officer Schenk.

B.    Retaliation Claim Against Defendant Miller

Plaintiff alleges in a conclusory fashion that Defendant Miller colluded with Officer Schenk to write the serious infraction that was ultimately overturned. (Am. Compl. at ¶ 20.) As there is no evidence in the record that Defendant Miller gave any input with respect to the 663

1  infraction issued by Officer Schenk, the Court presumes that Plaintiff means to challenge

2  Defendant Miller's issuance of the prohibited placement. (Miller Decl. at ¶ 7.)

3      Plaintiff has not provided any evidence, apart from his own conclusory assertion, to show

4  that Defendant Miller was motivated by anything other than legitimate penological goals when

5  he entered the prohibited placement. As Defendants point out, Plaintiff even acknowledged this

6  in his deposition when he was discussing the purpose behind the infraction and prohibited

7  placement when he stated, "I was told that based on Defendant Schenk having concerns for his

8  safety – and that was mentioned in the infraction – that prohibition was in place…" (Pl's Dep.,

9  Ex. 1 at 75:13-24.)

10      As discussed above, after meeting with Plaintiff on September 25, 2017 to discuss his

11  behavior toward Officer Schenk, Defendant Miller "believed that Alverto was fixating on

12  Schenk through long and intimidating stares and leering at him and also submitting baseless

13  complaints regarding him. I understood that Officer Schenk believed that this behavior was an

14  attempt to intimidate him and that Schenk was feeling targeted." (Miller Decl. at ¶ 3.) Defendant

15  Miller asserts that it is not common for him to be made aware of behaviors of specific

16  incarcerated individuals with respect to certain staff, as he is three levels of authority above

17  Officer Schenk and most issues with behavior are addressed at the unit level. (*Id*. at ¶ 6.) On

18  October 5, 2017, Defendant Miller authorized a prohibited placement for Plaintiff to provide him

19  with a "cooling period" so that he could have a fresh start if he were to return to the facility. (*Id*.

20  at ¶ 8.) He asserts that a prohibited placement was appropriate in this case because Plaintiff's

21  conduct caused Officer Schenk to fear for his physical safety, and always look over his shoulder

22  because Plaintiff "would not stop posturing, leering, and otherwise intimidating Schenk. When

23  relations between staff and incarcerated individuals reach this level, I fear that it could turn into a

physical altercation." (*Id*.) Finally, Defendant Miller explained that this prohibited placement was very limited in scope and duration, as it only applied to the WSR (not the whole MCC complex) for a period of six months, which is the shortest period of time for which he could approve a prohibited placement. (*Id*. at ¶ 9.) The Ninth Circuit has long recognized that the preservation of institutional order and discipline, and preventing potential assault, constitute legitimate penological goals. *See Barnett v. Centoni,* 31 F.3d 813 (9th Cir. 1994).

Accordingly, Plaintiff's conclusory assertion that Defendant Miller must have colluded with Officer Schenk is insufficient to establish a genuine issue of material fact to preclude summary judgment.

C.    Retaliation Claim Against the Roster Office Defendants

Plaintiff contends that the Roster Office Defendants, Erika Rogalski, Alma Holevinski, Kaitlyn Bos, and David Nevarez, "colluded" with Officer Schenk to assign him to locations where he would come into contact with Plaintiff. (Dkt. # 35 at ¶¶ 34-37.) In essence, Plaintiff's claim is that "Roster has access to resources that will indicate probable areas of conflict, and should know not to place Schenk in areas where there exist a possible safety/security concern." (*Id*. at ¶ 34.)

Plaintiff does not offer any support for these conclusory allegations, such as any evidence Officer Schenk requested assignments near the Plaintiff, the Roster Office Defendants received any such requests, or that they would even be able to honor them. As noted above, by the time Plaintiff's prohibited placement had expired, Officer Schenk had transferred to a position as a Relief and Training Officer. His new role entailed being assigned to posts within the five MCC facilities to fill in for other officers' scheduled and unscheduled absences. (Schenk Decl. at ¶ 2.) Officer Schenk's assignments as a Relief Officer occurs through the Custody Roster Office,

1    where staff fill vacant Correctional Officer posts throughout the MCC facilities on an as-needed

2    basis. (Holevinski Decl. at ¶¶ 3-4.) There are approximately 70 relief assignments made by the

3    Roster Office on a daily basis. (*Id*.)

4        Defendants have provided evidence that due to the volume of assignments that need to be

5    made every shift, the Roster Office staff generally do not place weight on special considerations

6    or the specific needs or preferences of staff in making the relief assignments, including

7    prohibited placements that incarcerated individuals may have. (*Id*. at ¶¶ 4, 6.) In fact, the Roster

8    Office does not have access to this information. (*Id*. at ¶ 7.) The rosters are generally set weeks

9    in advance and are not changed absent a last minute change in circumstances, or a decision by a

10   Sergeant "under the supervision of the Lieutenant through the chain of command." (*Id*. at ¶ 5.)

11   Correctional officers may not request specific posts or hours from the Roster Office Defendants.

12   (*Id*. at ¶ 9.) The rare instances where the Roster Office Defendants do not place an officer in a

13   particular post involves "an official personnel or other high-level investigation," in which case

14   the Roster Office is provided with "written direction from MCC's highest-ranking official with a

15   start date and specific assignment criteria." (*Id*. at ¶ 7.) Even in those instances, however, the

16   Roster Office Defendants are not provided with the reason for the reassignment. (*Id*.)

17       Accordingly, Defendants have provided evidence that Officer Schenk never requested

18   specific posts or hours – nor was there a mechanism for him to have done so – and the Roster

19   Office Defendants did not "collude" with Officer Schenk to request specific placements close to

20   Plaintiff. (*Id*. at ¶ 9.) In addition, nothing in the Roster Office system indicates that the

21   assignment of Officer Schenk to any post at MCC would be inappropriate, and therefore the

22   Roster Office Defendants were free to assign him to any and all posts as needed. (*Id*.) The Roster

23   Office Defendants have no mechanism to consider the specific circumstances for the alignment

1    of posts. (*Id*. at ¶¶ 4-7.) Even if they did, the prohibited placement from the WSR had expired

2    prior to the placements at issue. Finally, the Roster Office Defendants assert that they had no

3    awareness of Plaintiff's grievance activities or other complaints, and Plaintiff has not provided

4    any evidence to the contrary. (*Id*. at ¶ 10.)

5        Plaintiff's conclusory assertion that the Roster Office Defendants must have "colluded"

6    with Officer Schenk to retaliate against him is insufficient to establish a genuine issue of material

7    fact to preclude summary judgment.

8        D.    <u>Retaliation Claim Against Defendant Maxson</u>

9        Plaintiff alleges that the Grievance Coordinator, Pete Maxon, retaliated against

10   him for Plaintiff's use of the grievance system by purposefully altering one of his grievances

11   (replacing the word "design" with "decision") as part of the appeal process, thereby "improperly

12   misrepresenting Plaintiff's intent in the Grievance No. 17640575." (Am. Compl. at ¶ 14.)

13   Plaintiff asserts that "Maxson's actions are retaliatory and motivated by the Plaintiff filing

14   grievance(s) against Schenk." (*Id*.)

15       As a threshold matter, Defendant Maxson did not personally type the appeal, as "this is

16   typically a duty of the office assistant in the grievance unit." (Maxson Decl. at ¶ 8.) In order to

17   support a claim against a defendant, Plaintiff must demonstrate that the particular defendant has

18   caused or personally participated in causing the deprivation of a particular protected

19   constitutional right. There is no evidence that Defendant Maxson was personally involved in re-

20   typing Plaintiff's grievance, or that he made the typographical error intentionally. As there is no

21   evidence that Defendant Maxson personally participated in the alleged violation, Plaintiff's claim

22   against him must be dismissed.

23

Even if Defendant Maxson did personally re-type the grievance, which Defendant Maxson asserts he "processed . . . as typed" because he was unaware of the error, "the inadvertent replacement of the word 'design' with 'decision' did not alter my processing of the grievance . . . the meaning of the [sic] Alverto's allegation – that Department cameras were intentionally not placed in specific locations" is the same regardless of the typo. (*Id*. at ¶¶ 8-10.) The typo, without more, does not constitute adverse action necessary to support a retaliation claim. Moreover, Plaintiff has not provided any evidence that the typo changed the outcome of his appeal, or was caused by an intent to retaliate against the Plaintiff. Plaintiff's claims against Defendant Maxson are insufficient to establish a genuine issue of material fact to preclude summary judgment.

Accordingly, as the Court has found that Plaintiff has failed to establish a genuine issue of material fact as to his retaliation claims against any of the Defendants in this case, it is unnecessary for the Court to address the issue of qualified immunity. In addition, the Court GRANTS Plaintiff's unopposed motion to withdraw his state law claims. (Dkt. # 66.)[4]

## IV.   CONCLUSION

The Court recommends that Defendants' cross-motion for summary judgment and response (dkt. # 40) be GRANTED, Plaintiff's motion to withdraw his state law claims (dkt. # 66) be GRANTED, Plaintiff's motion for summary judgment (dkt. # 48) be DENIED, and this case be DISMISSED with prejudice. A proposed order accompanies this Report and Recommendation.

---

[4] The Court understands Plaintiff's motion to withdraw his state law claims to be a concession that the Defendants correctly argued that Plaintiff failed to present his tort claims to the Office of Risk Management as required by RCW 4.92.110.  (Defs.' Mot. Summ. J. at 22-23.)

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14) days** after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **January 17, 2019**.

The Clerk is directed to send copies of this Report and Recommendation to the parties and to the Honorable John C. Coughenour.

Dated this 20th day of December, 2019.

MICHELLE L. PETERSON
United States Magistrate Judge